Choice *vs.* Marshall.

No. 17.—Leonard F. Choice, by his guardian, &c., plaintiff in error, *vs.* Stephen B. Marshall, defendant in error.

Where a testator bequeathed to his daughter certain negroes, with their future increase, "*during her natural life and the heirs of her body forever ;*" held that the words must receive their technical signification—there being nothing in the will to authorize the belief, that the testator may have used the words improperly and not in their legal meaning.

This was a bill in Equity, brought in Putnam Superior Court, against Stephen B. Marshall by Leonard F. Choice, an infant, who sued by his guardian, John Graybill. It alleged that Leonard Fretwell, the grandfather of the complainant died testate in the year 1820, leaving, unrevoked and in full force, his will—a copy of which is hereto appended.[a] That, by the third item in said will, particular negroes were, by the testator, bequeathed to his daughter, Mary Fretwell, "*during her natural life, and the heirs of her body forever.*" That after the death of her father, Mary Fretwell intermarried with one William Choice ; and that the said negroes, by the assent and approbation of the Executors, went into the possession of her said husband, who held them by virtue of his marital rights. The bill further stated that the complainant was the only child of the aforesaid marriage ; that Mary, the mother, was dead ; and that he was entitled to all of the negroes, with their increase mentioned in the third clause of the testator's will. That Cloe, one of said negroes with her descendants—children and grandchildren— had got into the possession of the defendant by purchase or otherwise, who refused to deliver them up, or account for their hire. There was the usual prayer for relief. To this bill the defendant demurred. First, for want of Equity ; and, secondly, because the party had full and complete remedy at common law. The cause came on for hearing, before the Hon. J. A. Merriwether, circuit Judge, March Term, 1846 ; who

---

(*a*) *Copy of Leonard Fretwell's Will.*

In the name of God, Amen ! I, Leonard Fretwell, of the county of Putnam and State of Georgia, weak of body, but of sound mind and memory, and bearing in mind the mortality of my body, and knowing that it is appointed for all men once to die, do make, constitute, and ordain this my last will and testament, in manner and form following, viz : Item 1st. I give and bequeath unto my son, John Fretwell, the tract of land whereon I now live—also the following negroes, viz : Charles, Moses and Jesse, to him and his heirs forever. Item 2d. I give and bequeath unto my daughter, Martha, during her natural life, and the heirs of her body forever, the following negroes, with their future increase, viz : James, Nancy, Suckey, Phebe and Eliza— also one bed, bedstead, and furniture, and a good saddle and bridle. Item 3d. I give and bequeath to my daughter, Mary Fretwell, during her natural life, and the heirs of her body forever, the following negroes, with their future increase, viz : Lydia, Cloe, Lucy, and Joe, also one bed, bedstead and furniture and a good saddle and bridle. Item 4th. I wish for my daughters, and their negroes to continue to live together with their brother, and work as heretofore, as long as they see cause. Item 5th. After the payment of my just debts I give and bequeath the balance of my estate, both real and personal, to my son, John Fretwell, to him and his heirs forever. Item 6th. I nominate John Fretwell and Jesse Little, Executors to this my last will and testament. In witness whereof I have hereunto set my hand and seal this 14th of April, 1820.

7

sustained the demurrer on the *first* ground, and decided, that by the *third* item in her father's will, Mary Fretwell took an absolute estate in the property bequeathed in said clause—the words " *heirs of her body for-ever*," as used therein, being words of *limitation*, and not of *purchase*. To this opinion of the court below, the complainant excepted, upon the ground, That the words used in the *third* item, conveyed an estate for life only to Mary Fretwell, with remainder in fee to complainant as a purchaser.

F. H. Cone, for plaintiff in error.

The intention of the testator is the governing rule in the construction of wills. This rule is paramount to all others, not even a technical meaning attached to any particular words, controls it.—*Doe* vs. *Laming*, 2 *Burrows*, 1100; *Croke James*, 570; *Hargrave's Law Tracts*, 565, 572, 575; *Fearne on Remainders*, 186; 1 *Munford*, 537; 14 *Johns. Rep.* 1; 2 *Dallas*, 244; 6 *Peters*, *R.* 68. The authorities, which are abundant, are all on one side. Indeed, it would seem strange that any other rule should prevail, in relation to the construction of any instrument. This intention must be lawful. That is, the testator cannot make a disposition of his property that the law prohibits. But before a court can refuse to carry into effect the provisions of a will, they must be satisfied that the testator intended to do that which the law prohibited from doing.

This is never to be presumed; for when two constructions can be given to a will, one of which is lawful and the other unlawful, that which is lawful shall prevail; for no man shall be presumed to have intended an unlawful act. What was the intention of the testator in the will under consideration? He appears to have had a son and two daughters, the objects of his bounty. To the son he gives his property absolutely, " to him and his heirs forever." To each of his daughters he gives the property to them for life, and to the heirs of their bodies forever. Certainly he did not intend the same estate to his son and to his daughters. The estate is to his daughters for life only. Could any superadded words make the intention clearer than that he only intended an estate for life to them? This was a lawful intention; he had a right to restrict them to a life-estate if he thought proper. But it is said the remainder is to the " heirs of their body forever." This is true, and this brings us to the only question in this case. Whom did the testator mean by the words, " heirs of her body forever?" Did he intend to describe a class of persons who should take in succession from generation to generation, in all coming time, or did he intend the children of his daughter Mary? If the court are satisfied that he intended the former, and that his object in using these words, was to entail this property upon the lineal descendants of his daughter, then the case is for the defendant, because such intention is unlawful. But if the court shall come to the conclusion that such was not his intention, but that, by the use of the words " heirs of the body," the testator intended to designate the children or grandchildren of his daughter, then the case is for the plaintiff. If the words were used in the former sense, they are words of *limitation*, and describe the extent of the estate that his daughter was to take. If in the latter, they are words of *purchase*, and describe the persons that are to enjoy his property, after the death of his daughter. I contend that it is wholly immaterial by what words an idea is conveyed to the mind; the only inquiry for the court is, are we satisfied that the testator did not intend to entail this property? If the court is satisfied that he had no such intention, they are disappointing his intention by saying that he had, and they are violating that positive and unbending rule of law that says, the intention *shall govern*. But it is said that the words, " heirs of the body," create an estate tail, according to the rule in Shelly's case. This may be true; but the rule in Shelly's case was made to effectuate the intention of testators, not to disappoint them. It was a rule established by the English courts, several centuries ago, at a time when estates tail were not only lawful but very common. It was, therefore, fair to presume that by the use of these words testators intended to create such an estate. Indeed it was admitted then, and in all subsequent cases where the rule has been applied, that such was the general intent of the testator; and although by giving a previous life estate he had manifested an intention that the first taker should have only such an estate, yet as this was a particular intent, and

as the general intent was to create an estate tail—as these two intents could not stand together, the particular intent must yield to the general intent, according to a well-known rule of construction. This, together with reasons of Feudal policy, which never existed with us, are the reasons for the establishment of the rule in Shelly's case. In most of the cases that have occurred since the decision in Shelly's case, the English courts have admitted that the rule must yield to the superior force of intention, and have, therefore, laid hold of any words that showed a different intention.—*Doe* vs. *Laming*, 2 *Bur. Rep.* 1100; *Perrin* vs. *Blake, 4th Bur.* 2579; 2 *Vent.* 341; 1 *Ves. Sen.* 145; 4 *Bro. C. C.* 542. In the case of Doe vs. Laming, Lord Mansfield, after referring to all the leading cases on the subject, and reviewing of them, says: " It appears, therefore, that there is no such invariable rule of construction, as has been supposed, that words of limitation (heirs of the body) shall never be construed words of purchase ;" and they were so construed in that case. In a subsequent part of the same decision, the learned judge remarks : " There is no rule of law that prevents heirs, *or heirs of the body*, being taken as purchasers, where the intention of the testator requires that they should be so." Such was also the opinion of the other judges who sat in that case. The same doctrine has been fully established in our sister States.—1 *Hen. and Munf.* 240; 3 *Coll.* 50; *Devereux Eq. Rep.* 189; 4 *Hawkes' Rep.* 227; 1 *Dessausure,*353; *Miss. Rep.* 280; 1 *Bailey's Rep.* 119; 1 *Porter's Rep.* 152; 4 *Stewart and Porter,* 286; 6 *Yerger Rep.* 96; 9 *Ib.* 4; besides a vast number of other cases, to which it is unnecessary to refer. It may be said that in most of the cases referred to, and others that may be found in the books, that these were words of explanation referable to the words, " heirs of the body." This may be true, but it does not alter the principle, or the criterion by which the judgment is to be formed. These superadded words are evidence that the testator did not intend by the use of the words, " heirs of the body," to create an estate tail. These may be necessary in a country where estates tail are lawful, in order to rebut the presumption that the testator intended to create such an estate. But can they be reasons here, where estates tail, if they ever practically existed at all, have been abolished since 1777.— *Watkins Dig.* 15. Can the court believe that this testator intended by the use of these words to create an estate which had been abolished, and made unlawful for nearly half a century previous to the making of the Will, and which estate at the time he was attempting to create, he knew that he could not create ? Is this court to presume that by the use of these words, " heirs of the body," this testator intended to do a thing which was unlawful, and which he knew he could not do ? because by the use of the same words in England, it has there been presumed that the testator intended to create an estate tail, which is a lawful estate, and which a testator there has a perfect right and power to create. It appears to me that the presumptions here are entirely different from what they are in England, because our law is entirely different.

It is a question of intention, looking to the habits, laws and circumstances with which we are surrounded. If the court come to the conclusion that this testator did intend to create an unlawful estate—that such was his object in the use of these words, " heirs of the body," then the case is for the defendant ; but if their minds are satisfied that he had no such unlawful intention, but intended to provide for his grandchildren—the children of his daughter Mary—then the case is for my client.

JOHN G. MCHENRY for defendant.

The entire controversy in this case, as appears, grows out of the construction and operation of the term heirs of her body forever.

The general rule of law is, that those terms do not denote any particular person, to take by way of description, as devisee, grantee, or donee. Neither does any estate, by the use of those terms, vest in any person in character of heir, but only in the person of him who is named in the instrument of conveyance, who takes by purchase. But the heirs there named do not take as purchasers—they are words merely descriptive of the estate given.—*Reeves' Dom. Rel.,* 455; *Brett* vs. *Rigden, Plow.,* 343.

The following is an incontrovertible position, and so generally allowed, that whereever an estate is given to any one for life, and to his heirs, or to the heirs of his body, and there is nothing more in the case, the first taker invariably takes a fee simple in the former case, and a fee tail in the latter ; and this as well in a devise, as in any other instrument of conveyance. The words " for life" being considered as mere surplus age. Thus far, this rule which has been laid down in Shelly's case has pre-

vailed without contradiction.—*Shelly's case*, 1 *Rep.*, 93 ; *Tucker's Com.*, 135 ; *Reeves' Dom. Rel.*, 457.

However, as contended for in deeds, but more especially in devises, the above-stated rule has been broken in upon, where the intention of the testator to do so manifestly appears, and such intention is consistent with the rules of law, which proposition we readily admit. And here we propose to call the attention of the court to the principal leading cases where apparently the rule of law as laid down has been made to yield to the manifest intention of the testator, and point out wherein we conceive the case at bar differs materially from those cases ; and in doing so we propose simply to cite the cases, state the terms of the devise or conveyance, give the judgment of the court, and point out what we conceive to be the striking want of analogy to the case at bar.

The first case which we call the attention of the court to, is the case of *Archer Co. R.* 66—" which was a limitation in a devise to A for life, and to the next heir male of the body of A, and the heirs male of such next heir male."—" Held that A took an estate for life only, and the heir male a remainder in tail, vesting in him by purchase, and this from the manifest intention of the testator." To the same purpose is the case of *Clerk and Day*, *Cro.*, *Eliz.*, 313. For although the phrase " heirs male" was sufficient to give an estate tail, and such limitation to A for life, and to his heirs, would have given an estate tail in A, yet the using of the phrase " *next heir male*," and the superadded words of limitation, " his heirs male," it was manifest that he used the phrase " *next heir male*" as descriptio personæ who should take an estate tail, and consequently A took no greater estate than one for life.

To the same purpose is the case of *Luddington* vs. *Kine*, *Ld. Raymond*, 203— where A devised lands to B for life, without impeachment of waste, and in case he should have any issue male, then to such issue male and his heirs forever. Held to be an estate for life only in B, and a contingent fee in his issue male. Determined clearly on the manifest intention of the testator—for if B is supposed to take an estate tail, then must be rejected the words " without impeachment of waste," and the superadded words " his heirs forever." Here there were words which clearly manifested the intention of the testator to use the term " heirs," as a descriptio personæ, to wit, the superadded words of limitation and the phrase " without impeachment of waste," as waste.

So was the case of *Backhouse* and *Wells*, 1 *Eq. Cas. abr.*, 184. The devise was to A for life only ; and after his decease to the issue male of his body and to the heirs male of the bodies of such issue.

To the same purpose is the case of *King* vs. *Melling*, 1 *Vent.* 231—where there was a devise to one for life and " *non aliter*," and after his decease to the sons of his body. Held to be an estate for life in the first taker on account of the words " *non aliter*"—thus decided for the same reasons as in the above cases. The intention was gathered from the devise. For establishing the same ground *Lowe* vs. *Davis*, *Ld. Raym.* 1561, is relied on, which was a devise. Benj. Devon and the heirs of his body, the first, second, and third, and every other son and sons successively, of the body of the said Benjamin, and the heirs of the body of such first, second, and third, and every other son and sons lawfully issuing, as they shall be in seniority of age and priority of birth—the eldest always, and the heirs of his body to be preferred before the youngest, and the heirs of his body—and in default of such issue then to his right heirs forever." Held that Benj. Devon took an estate for life only upon the manifest intention from the construction. Again in the case of *Lisle* and *Gray*, *T. Raymond*, 315, where John Lisle covenanted to stand seized of lands to the use of himself, for life ; remainder to his son Edward for life ; remainder to the first son of Edward in tail ; with like remainders to his second, third, and fourth sons, and sons separately and respectively ; to each of the heirs male of the body of Edward, and the heirs male of their bodies ; remainder to William Lisle : Held to be a life estate in Edward for same reasons of intention. And such seem to be the real grounds of the decision of *Lord Hardwick* in the case in 1 *Vesey*, 142, viz : a manifest intention on the part of the testator to designate the heirs as purchasers, from the language used in the devise—although *Lord Hardwick* considers this case as being different from a legal estate, being a trust estate cognizable in equity. But we rely not on this distinction, as this ground of difference is clearly overruled in several cases.— *Watts* vs. *Ball*, *P Wms.* 108 ; *Philips* vs. *Philips*, *P. Wms.* 35 ; the opinion of *Wills* in *Perrin* and *Blake* ; *Ld. Mansfield* in *Doe* and *Laming*, *Bur.* 1100 ; *Jones* and *Morgan*, *Br. C. C.* Farther to establish the point that where a testator gives an estate to one, and remits it over to the heirs of his body, and plainly intends that the

heir shall take by purchase, this intention shall control the case of *Doe* and *Laming* is relied on, *Bur.* 1100, by the other side. This was a devise of gavelkind lands to A C, and to the heirs of her body, as well females as males. Here the intention was manifest that heirs must take as purchasers, and necessarily A C only a life estate ; as females could not take, in a course of descent, lands that were gavelkind.

In the case of *Doe* vs. *Laming* is cited the case of Walker and Snowe, (*Palmer*, 349,) which was upon a deed where E conveyed lands to the use of himself for life, remainder to his first son and the heirs male of his body begotten, &c., and so to his six sons, remainder to the right heir male of the said E, to be begotten after the sixth son and his heirs male. This was holden not to be an estate tail in E. Your honors will observe that the foregoing decisions have been based upon the ground that the legal construction or technical sense of any words shall not prevail against the intention of the devisor or grantor, when that intention is clearly collectable from expressions used in the instrument; and wherever it becomes certain that the term " heir or heirs " are used to designate individuals as purchasers, (from qualifying expressions or superadded words,) the courts have so construed them.—*Reeves' Dom. Rel.* 465; *Kent Com. vol.* 4, 221, 232.

But, on the other hand, if the testator designed to give the estate to those persons known in law as a class called " *heirs*," be they who they may, they must take by " *descent*," and not by " *purchase*." And to this point we call your honors' attention to the case of King and Melling. This was determined at first to give only a life estate, but was subsequently reversed.— *Vent.* 225 ; *Reeves' Dom. Rel.* 466.

Again ; this doctrine is supported by *Coulson* vs. *Coulson.*—2 *Atk.* 246. This was a devise to C for life, remainder to A and B, and their heirs, to preserve contingent remainders to the heirs of the body of C. In this case it was determined that an estate tail in remainder was vested in C, he taking a life estate not merged by the devise to the heirs of his body, by reason of the remainder interposing between the devise to C for life and the subsequent limitation to the heirs of his body. Despite of what seemed to be the intention of the testator, it was made to yield to the rule of law that the ancestor cannot " *make his heir purchaser, eo nomine.*" This case, decided in 1744, has been recognized to this extent since as law.—*Kent Com.* 223 ; *Reeves' Dom. Rel.* 478–9. This decision is also sustained by the case of *King* vs. *Burchell*, *Bur.* 1103 ; *Minshall* vs. *Minshall*, 1 *Atk.* 412. The notable case of Perrin and Blake, though in B. R. determined at first to convey only a life estate to the first taker, was subsequently, in Exchequer chamber, upon a writ of error, reversed.—*Reeves' Dom. Rel.* 474.

The case of *Bale* vs. Coleman, which was a devise to A and his heirs for payment of debts, and then to A for life with power to make leases for 99 years, remainder to the heirs male of A, was determined by Ld. Cowper to be an estate for life, but on a rehearing before Ld. Harcourt, was held to be an estate tail.—1 *P. Wms.*, 142. Since the determination of the case of Coulson vs. Coulson, there have been determined on the same principles the cases of Sayre and Watterman.—*Hodgson* vs. *Ambrose*, *Douglass Rep.*, 337.

Since the determination of the case of Perrin and Blake, Lord Thurlow has held in the case of Jones vs. Morgan, 1 Br. C. C. 206, that a devise to trustees to stand seized to the use of A for life, and after his death to the use of the heirs male of his body severally successively, and in remainder, created an estate tail in A upon the same grounds of the preceding cases, that whoever takes in character of heir must take in quality of heir. All the efforts of the party to change the qualification, while he admits the character of heir, by saying that they shall take as purchasers or otherwise, are fruitless, and of no avail.

The conclusion that we arrive at from this cursory view of the authorities is, that where a testator uses technical expressions only, their technical meaning must be adopted, for this appears as the safer method of effecting his intentions. Where the term " heirs " is used, there being nothing else in the instrument or context to point out that he used them as designatio personarum, although he may have intended that they should take as purchasers, in character of heirs, this intention cannot be fulfilled, being in contravention of law.—*Reeves' Dom. Rel.* 479, 467 ; 4 *Kent's Com.* 221, 232.

But may it please your Honors, admitting for the sake of argument the position assumed by opposite counsel, that this is one of these cases where the intention can be ascertained, and that intention designed Mary Fretwell to take merely a life estate, (which certainly does not appear either from the entire instrument or the context,) what would be the construction given by the court to this devise ? Would it not held that Mary Fretwell took a life estate and her children a fee tail general ? Now by

our statute vesting the fee simple in the first taker, when an estate tail is attempted to be created, did not this fee simple vest in the first taker here, and marital rights of the husband attach thereon. Counsel certainly could not contend that at common law, the heirs of Mary Fretwell would have acquired any other estate than a fee tail, for no case can be found, where the intention of the testator has been allowed to prevail so that the character of the estate in remainder, when *definitely prescribed*, could be altered or enlarged.

Wm. C. Dawson in conclusion for defendant.

Lumpkin, Judge, having stated the facts of the case, proceeded as follows :—

We have bestowed upon this case the fullest consideration—which the time would permit—allowed for that purpose by the legislature, and are of the opinion that the judgment of the circuit court is correct, and ought to be affirmed.

The question mainly argued by the counsel for the plaintiff in error is—what the testator did *not* intend, and not what he *did*. By showing that he *did not* intend that his daughter Mary should take a larger estate than one for life in the property left her, he insists that it will do violence to the will to put an interpretation upon it that will give her the *fee*. Suppose that Mary had been the only child of the decedent; that he had bequeathed to her the whole of his negroes, with their future increase, during her natural life, and at her death directed the slaves to be emancipated? Is it not quite manifest that, in this case, the design of the testator would be to limit the legacy to life only? And yet, would not the law prohibiting manumission supervene this purpose, and vest the remainder in fee in the daughter? It is conceded that the cardinal rule in the construction of wills, is—that the intention of the testator shall govern. To this admission there is an important qualification, namely : so *far* as that intention is consistent with the laws of the land, and *no farther*. To stop short of this would be an infringement of that liberty of disposing of a man's own property, which is the most powerful incentive to honest industry, and is therefore essential to a free and commercial country; while, on the other hand, did indulgence to a testator's intention go beyond this, every man would make a law for himself, and the metes and boundaries of property would be vague and indeterminate, which would end in total insecurity.—*Har. Law Tracts*, 489. One of the first and most prominent examples to be found in the decisions, illustrative of the principle that the intention of the testator cannot control the construction if repugnant to law, is :—" *Where the devise would create a perpetuity.*"—*Vide Hovenden on frauds*, 255, *and the cases there cited in note* 88. And notwithstanding President Pendleton in *Kennon* vs. *McRoberts et eux*, (1 *Wash. Rep.* 102,) claims extensive latitude in the construction of wills, and speaks rather jeeringly of the judges having laid down rules by which they have tied a gordian knot, which they have since struggled in vain to unloose, and which he asserts it would have been better if they had cut at once. Still he admits that the disposition *intended* to be made must not conflict with the rules of law—" *which he understands as applying to restraints upon perpetuities, devises in mortmain, and the like.*" He declares, also, that " the *intention* is *not* to prevail against settled and fixed rules of construction."

Will it be said that when the testator's intent is manifest, that the court

will carry it into execution in despite of all the well-established rules of interpretation? It would be to clothe the judicial tribunals with a discretion which would illy comport with the well-defined powers of the various departments of our government.    A father desires to bestow upon his son real estate sufficient to qualify him to be governor, and, to *that intent,* devises him a *lease for a term of years* of five hundred acres of land: could we convert, in this instance, however plain and praiseworthy the *intent* of the testator, a *lease* into a *freehold?*    Surely not.    So, though an estate be devised for life only, or for life, and not otherwise, or with any other restrictive expressions, yet, if there be afterwards added proper words to create an estate of inheritance in the *heirs of the body,* the latter language shall overbalance the former and make the first legatee tenant in fee.—*She'ley's Case,* 1 *Coke's Rep.* 96; *Butterfield* vs. *Butterfield,* 1 *Ves. Sr.* 133, 154; *Gath* vs. *Baldwin,* 2 *Ves. Sr.* 646; *Atkinson* vs. *Hutchinson,* 3 *Pr. Wms.* 259; *Daw* vs. *Chatham,* 2 *Fearne,* (347,) 464; *Robinson* vs. *Fitzherbert,* 2 *Bro. Ch. Rep.* 127; *Webb* vs. *Webb,* 1 *Pr. Wms.* 132.    In all of these cases, as well as many of those which follow, there was an estate limited to one for life; the remainder to the heirs of the body, and the courts uniformly held, that the whole interest vested in the first taker, and that too, as the Lord Chancellor declared in one of them, *whether the testator intended it or not.*—*Hinson and wife* vs. *Pickett; Myers admr.* vs. *Pickett,* 1 *Hill Ch. Rep.* 35; *Horne et al. Lessee* vs. *Lyeth,* 4 *Harris and John. Rep.* 431; *Ward ads. Waller et al.* 2 *Speers' Rep.* 786; 9 *Yerger,* 209; 3 *Batt. Rep.* 455; 2 *Wash. Rep.* 9; 1 *Dall.* 47; *Binney's Rep.* 139; *McFeely* vs. *Moore,* 5 *Han. Ohio Rep.* 465.    These cases are selected almost at random from the thousand and one which crowd the books of reports upon this doctrine.

The true inquiry, therefore, in the present case is, not what estate Leonard Fretwell intended to give to Mary his daughter, but what disposition he designed making of the remainder?    No one, I apprehend, doubts that Mary Fretwell was intended to take a life estate only, and that her heirs were intended to take after her, but *how* those heirs were intended to take, whether as *descendants* or purchasers, is the question, and the *only question.* If they take as purchasers, then Mary Fretwell and William Choice, her husband, are tenants for life only, and the complainant in the cause below was entitled, after the decease of his mother, to sue for and recover the property.    If, however, Leonard Fretwell meant that the heirs of his daughter should take by descent, or had formed no intention about the matter, then by irresistible consequence of law, the inheritance vested in the mother and through her, in the husband, from whom the defendant in the Bill (Marshall) derives his title.    And the burden is upon the plaintiff in error.    It is incumbent on him to show that the devisee shall take a different estate from what the plain legal import of the words conveys. Has he met and removed the difficulty?    Has he shown that not only a mere life estate was given to the daughter, but that the testator has evinced that he did not intend to violate the policy of the law by creating a perpetuity?    We think not: not a single authority has been adduced to justify the position, that the testator intended to deviate from the general rule, and it has been truly said that this is never supposed till made out, not by conjecture, but by strong and conclusive evidence; or, in the nervous language of Lord Hobart, by "declaration plain."

The first case cited at bar is that of *Smith* vs. *Bell*, (6 *Peters' Rep.* 68,) in which Chief Justice Marshall reiterates only what had been asserted in every testamentary disposition, previously, to wit : that the intention of the testator expressed in the will shall prevail, *provided it be consistent with the rules of law.* But how is this intention to be collected ? He furnishes the answer *"from the words."*

Lord Mansfield's opinion in *Doe, &c.* vs. *Laming*, (2 *Burrow*, 1100,) is relied upon, and the Sticklers for the rule in Shelly's case have animadverted on it, as we think, with unnecessary asperity. It grew out of a clause in the will of one Martin Long, to this effect : " Also I give and devise one other equal, undivided fourth part, &c., unto my niece Anne, now wife of William Cornish, and to the heirs of her body lawfully begotten, or to be begotten, as well *females* as male, and to their heirs and assigns forever, to be equally divided, share and share alike, as tenants in common, and not as joint tenants." Had the testator stopped at the words, " heirs of her body lawfully begotten, or to be begotten," would the court have hesitated a moment? On the contrary he heaps sentence upon sentence, circumstance upon circumstance, in order to tell every reader of his will how he would have it understood. The whole premises devised were gavelkind, and Lord Mansfield remarks—that it is obvious that the testator does not mean that the one fourth given to Anne Cornish should go in a course of descent in gavelkind ; for he gives it to the heirs of her body *as well females* as males ; and mentions *females*, not only expressly and particularly, but even prior to males ; therefore they *cannot take otherwise than as purchasers.* It would be a *void* devise, if the words were to be construed as words of limitation, for he breaks the gavelkind descent, by giving it to *females*, as well as males. It cannot descend to females as well as males by the rules of gavelkind, and yet he seems to lay the chief stress upon the word *" females."* He adds likewise, " and to their heirs and assigns forever, to be *divided equally, share and share alike ;"* nay, he goes further, *" as tenants in common* and not as joint tenants." But this could not be, if they were to take in the course of *gavelkind* descent, for in such case they must take as *coparceners.* In expounding this clause of the will there were other portions which reflected light upon it, and which n. ↑↑erially influenced the court in ascertaining its meaning.

The decision in *Bradley* vs. *Mosby*, and *Walton* vs. *Mosby*, (3 *Call's Rep.* 50,) rests expressly upon the ground, that the slaves were given to the only proper use and behoof of the daughter of the donor during her natural life, and to the heirs of her body, to the only proper use and behoof of such heirs, *"their executors, administrators or assigns."* And Judge Roane, after noticing this distinction as settled by previous adjudications, states that if the use of the negro only had been given to the daughter for life, and a *naked* limitation engrafted thereon to the heirs, that he should have held that the *whole property vested in her.* The limitation over was supported in *Warners* vs. *Mason and wife,* (5 *Munf. Rep.* 242,) not because the testator devised the track of land, the subject matter of dispute, to the first taker *during his natural life*, but because of the expression—" and then to his heirs lawfully begotten of his body, *that is born at the time of his death, or nine calendar months thereafter."* Here the words " heirs of his body" were not considered words of limi-

tation, but as *designatio personæ*, as was evident from the testator's describing those heirs as persons " *born at the time of his death, or nine calendar months thereafter.*" If the case of *Keith* vs. *Perry*, (1 *Dessaussure*, 353,) stood in opposition to the doctrine maintained by this court, (as it clearly does not,) it would be sufficient to say, that it has been overthrown by a series of subsequent adjudications in the same State.—See *Guerry* vs. *Vernon*, 1 *Nott and McCord*, 69 ; *Henry and wife* vs. *Felder*, 2 *McCord's Ch. Rep.* 323. In *Anderson* vs. *Jackson*, (16 *John. Rep.* 398,) the word *survivor* was held sufficient to show that the legacy was intended as a personal benefit to take place during the life of the person to whom the benefit was individually intended. In *Bell and wife* vs. *Hogan*, (1 *Stewart's Rep.* 536,) the court, it is true, supported the remainder as good and not too remote. It took care, however, notwithstanding the eloquent strictures of Chief Justice Lipscomb upon the rigor of the rule, to show that this case was withdrawn from its operation by the peculiar phraseology of Thomas B. Whitwell's will. The testator " lends to his daughter Elizabeth six negroes (naming them) and their increase during her natural life, and if she should *leave* an heir or heirs lawfully begotten of her body, *then* gives them to such heirs forever ; and for want of such heirs, *then* to A. W. and others." It requires no comment to distinguish this case from the naked limitation in Leonard Fretwell's will. An argument has been drawn from *Archer's* case, (1 *Coke*, 66 ; *Fearne*, 150,) where the limitation was to A. for life ; and after his death to the next *heir* male, and to the heirs male of the body of such *next heir male*. It was held that the devise to the heir was considered as a remainder to him by purchase. Now it is urged, that as primogeniture does not exist with us, that the term " *heirs* " in the plural answers to the term " *heir* " in the singular in England, and that all the reasonings that are applicable to the word " heir " in the singular there, hold with equal strength and propriety, when applied to the plural termination " heirs " here. We will not stop to examine at present the soundness of this logic. It will be time enough to do this when a parallel case occurs.

There is no difference, said the court in Virginia in *Bradley* vs. *Mosby*, (3 *Call*, 57,) between *heir* in the singular number, and heirs ; since one and the same person takes in both instances, in case of land, in England. In Archer's case, the word " heir," it is true, was in the singular number, but it was preceded by the word " next," and what is more important, words of limitation were engrafted on it, which made the next heir the root of a new inheritance, the terminus or stock of a new descent, by reference to whom the future succession was to be regulated. It is contended, that inasmuch as the testator gave an estate in fee to his sons, and used proper language to that end, that therefore he understood the import of the terms introduced into his will, and that he could not have *intended* his daughters to take the same estate with his sons—in the bequests to whom, different phraseology altogether is employed. This is, no doubt, true ; but the inference deduced from it would seem to operate the other way. In the legacies to his daughters, if professional ingenuity had been taxed to the utmost, more apt words could not have been selected, to create a limitation in indefinite succession. And there is no desire more deeply seated in the human breast, than the wish to

preserve the property we have acquired in the family that shall descend from our loins; consequently the natural presumption would be, that such was the intention of Leonard Fretwell. Be that as it may, such, and such only, is the legal operation of the words used by him; and although his purpose may be so far counteracted, as that his daughters will take a greater estate than he intended, still we are consoled by the reflection that this is but accomplishing the paramount policy of the supreme authority in this State, in providing, in 1821, that all bequests of property, expressed in such terms as would have passed an estate tail by the Statute of Westminster, commonly called the *statute de donis conditionalibus,* shall be construed to vest an absolute fee in the first taker. Mr. Justice Blackstone, in delivering judgment in the Exchequer Chamber, in the great case of *Perrin et al.* vs. *Blake,* states, that all the cases that had occurred from the Statute of Wills to that time, (a period of about two centuries,) in which *heirs* of *the body* had been construed to be words of purchase, were reducible to these four heads: either where no estate of freehold is given to the ancestor; or where no estate of inheritance is given to the heir; or where other explanatory words are immediately subjoined to the former; or, lastly, where a new inheritance is grafted on the heirs of the body: none of which, he adds, was the case then before the court; and none of which, we may add, is the present case. We have thus glanced, hurriedly, at the arguments and leading cases presented with so much zeal and ability by counsel for the plaintiff. We feel the full force of the learned counsel's general reasoning upon this question. We doubt not that the intentions of numerous testators have been defeated, by supposing, that they proposed doing an illegal act, which it was impossible for them to do. We have, with pleasure, discovered the tendency in the judicial mind, both in England and in this country, to relax the sternness and severity of the rule. We are prepared, although in our *judicial infancy,* to advance to the front rank in this warfare of principle against precedent. Beyond this we dare not go. Judges cannot alter a law of property, established for centuries, to suit their notions. The exercise of such a power would be arbitrary and destructive of all law. Their business is to declare what the law is, and not what it ought to be. That the gift of slaves to *A, for life, and to the heirs of her body forever, without* an other word of explanation from the testator, *must* be considered words of *limitation,* and not of *purchase,* is an inflexible rule, too strong and thoroughly established by all that is venerable in authority, to be abolished by any power short of that which enacts the law. To deny its binding efficacy in the present instance, would be to frame a will for the testator, and not to expound the one which he actually made.

"To disregard rules of interpretation," (says Chief Justice Dorsey, of Maryland,) "sanctioned by a succession of ages, and by the decisions of the most enlightened judges, under pretence that the reason of the rule no longer exists, or that the rule itself is unreasonable, would not only frustrate the great landmarks of property, but would introduce a latitude of construction boundless in its range and pernicious in its consequences."— 4 *Harris and Johns.* 435. Says Judge Cheves, of South Carolina, "It is of the utmost importance that rules, when established, should not be departed from, whether they are wise in themselves or not. In an en-

larged view of the duties and functions of Judicial tribunals, the determination of the particular cases which they adjudicate, is altogether of minor importance. In the more remote influence of a case in keeping a thousand of the like kind out of court, and settling the rules of property, is discovered its greatest value. The community generally, and the bar especially, ought to be able to know beforehand what will be the decision of the court on any question which may occur, and which is not new or anomalous. If this is true, it is (at least it ought to be) in vain to argue to a judicial tribunal on a question like this, that any rule heretofore laid down for the government of the construction of wills, should be departed from because of particular hardships, or of *new views* of *policy.* Where nothing is established, they may have their influence, and not otherwise. But the leading rule on this subject, is one which under our institutions should be cherished—I mean that which declares that perpetuities in the limitation of estates should be prevented. It is a highly useful auxiliary to that great provision of our Constitution, the abolition of the rights of primogeniture.—1 *Nott and McCord, Rep.* 71, 72. It is needless to add, that in the sound conservative sentiments so strenuously set forth by these eminent jurists, this court entirely concurs. Believing, therefore, that the law is with the defendant in error, we affirm with cost, the judgment of the Circuit Court.